The next case for oral argument is Hodapp v. Consumers Energy Company. Counsel, when you're ready, you may proceed. Your Honors, if you'll allow me. Please report, Counsel. Your Honors, my name is Ray Bell. I'm a firm of Holy and Mansfield. And I represent the industry felons in this case, Consumers Energy Company, as best as based lawsuit. This lawsuit was brought in Madison County, Illinois, by plaintiffs, Michigan residents, against numerous defendants, including Consumers, which is a Michigan corporation, arising out of an alleged bestest exposure to a plaintiff on Consumers' Michigan premises. Consumers has objected to the exercise of personal jurisdiction over it by an Illinois court, pursuant to the Illinois long-arm statute, as well as pursuant to the due process clause of the United States Constitution. We have appealed from the trial court's denial of her objection to personal jurisdiction because the trial court determined that general jurisdiction existed on, or based upon, Consumers' purported due in business in Illinois. Now, the trial court's determination of this was based solely on Consumers' membership in a corporation, which we termed MISO, M-I-S-O, which is the company's actually Midwest Independent Transmission System Operator Incorporated. There's no dispute that specific jurisdiction does not, or there's no dispute that it does not exist in this case, that it has not been claimed or asserted. Thus, I'll limit my argument and discussion to the issues of general jurisdiction and the due in business standard. For the benefit of the review, it's de novo based upon the trial court's ruling solely on the documents that have been submitted. We have three basic arguments or principles for our objection to jurisdiction. First is that Consumers is not doing business in the state of Illinois by participating as a member of MISO. MISO member companies, like Consumers, are not a unitary business or a co-op, which Judge Hurst and the trial court likened it to. And the exercise of personal jurisdiction, if asserted in this case, would violate the due process clause because there are no minimum contacts with the state of Illinois. An understanding of the nature of MISO and the nature of the relationship between MISO and Consumers is really crucial to an analysis or relation of the ship with the due in business standard. Because Judge Harrison... Is this like a grid? It is a grid, exactly. But it's not a co-op or a unitary business, which is what Judge Harrison likened it to. It's not accurate, and it's really quite the opposite, to be frank. MISO is a separate, independent organization that Consumers is a member of. There are 134 members of MISO. It's a regional transmission organization, which was developed under the authority of the Federal Energy Regulatory Commission to manage utility services in a region. In this case, the region is an 11-state region, including Illinois, as well as one of the Canadian provinces. I don't recall which one at the time. But it was created to increase competition in the electricity market and to prevent vertically integrated monopolies, which was a problem. MISO has control over its members, and those 134 or 132 members are energy producers, energy brokers, some municipal organizations, some co-ops, a bunch of different types of entities. But MISO has control over the members' transmission capability on the grid and coordinates the transmission service requests for power over the grid. It's an independent system operator, which serves to separate the operation of the transmission of power and the transmission grid and access to it from its members' economic interests in creating energy. One of the issues or problems was that you had these regional energy companies that were able to manufacture the energy and control the transmission, which reduced the competitive influence because other energy companies weren't able to come in and try to sell energy to that particular market because it was controlled, both the production and the transmission of that energy source. So we have MISO, which came in in that regard. It's not a co-op. It's not a unitary business. It's not in the nature of a parent-subsidiary relationship, not an agency, not an alter-ego situation. Consumers, on the other hand, is a utility based in Michigan, generates its energy in Michigan, sells its energy to customers in Michigan, has no sales to Illinois customers, no contracts to purchase energy from any Illinois utilities or producers in Illinois. Yeah, but if they don't sell enough, they produce more than they sell in Michigan, and then does not the rest of it go into the grid? And so then they get compensated back for what is used out of the grid, the difference. Well, actually, I'm not positive, but I think it might be the other way because I know that consumers have to purchase about 22 percent of their energy. Well, that means they're running short on what they produce. I think that's true. So they might be using Illinois energy. Yeah, well, and the thing is that that is very possible and speculative because we have an organization that runs these transmission guidelines, but the energy, obviously, in the grid is fungible, and there are hundreds or dozens if not hundreds of producers from 11 states and Canada that put their power into the grid. Right. So we're talking about something, again, based upon speculation, but such a minimal contact, and it's not deriving any revenue from sales to anybody in Illinois. All its sales are to Michigan utility customers. So we do not have a situation where consumers is purposely availing itself of Illinois benefits or the protection of Illinois law, not deriving any revenue from the state of Illinois. And again, consumers, on the other hand, is not licensed to do business in Illinois as a formed corporation or having registered agents in Illinois. So any ties with Illinois through MESA, which governs the 11-state region, any contacts are so minimal and fortuitous that it certainly should not be sufficient to revoke the jurisdiction of an Illinois court where there is no basis for specific jurisdiction because it simply does not do business in the state of Illinois. In the trial court, the court issued an order or opinion finding that the MESA entities should be treated as a unitary business, likened to a co-op, and stated that it showed purposeful availment of Illinois benefits. Again, that relationship between consumers is nothing of that type. It's really more of a government-regulated business-customer relationship in which there is energy purchased and sold. For a unitary business analysis to apply, it's really more of an income tax term under Illinois case law and tax regulation. It requires common ownership. It requires that companies be in the same business. And it requires functional integration of business by strong centralized management. And here we have none of that. We have consumers, which is one out of 134 members, that provides and purchases energy from this grid, MESA, pursuant to regulations of the Federal Energy Regulatory Commission. Didn't the trial court, when it talked about a unitary situation, wasn't that in a context in which it was an analogy as opposed to an actual definition of MESA? Correct. So it was using it in analogy almost in a literary sense. Right. I think that's exactly what the trial court was doing. I'm sorry? I understand where you're coming from, that he wasn't saying it was identical, but the tenets of that analysis just don't apply here because of these types of requirements. What we're talking about is such a tight relationship. These unitary businesses are most usually in a situation where you have parents and subsidiary corporations where their interests are so aligned that they can assert jurisdiction over one based upon jurisdiction over the other, including a strong centralized management. We just don't have that here. We have a completely independent corporation, not the same ownership, not the same management. So we don't think that it applies whatsoever, particularly when you're looking at jurisdictional purposes, which is a standard business for jurisdiction purposes. It is quite high, speaking of cases, fifth district cases included. It must also be noted that plaintiffs in this case, the person asserting jurisdiction has the burden of approving jurisdiction, and we don't think that that's met in this case. The trial court as well as the plaintiffs attorneys have cited two cases which they claim are analogous, and those are Alderson v. Southern Company and another which is an Illinois case, which is a federal court in Washington or Oregon, I'm sorry. They are completely distinguishable factually. Both involved direct agreements by the defendants with companies in the foreign state. In Alderson, as a matter of fact, the defendant, which was based in Indiana, had a contract to sell most of its energy out, about $25 million out of $27 million or something like that, to Commonwealth Edison for consumption by Illinois consumers, and that was the core purpose of their contract. In Pacific Corp, the defendant, whose name Grant, was a Washington corporation, had a contract with Pacific Corp, an Oregon corporation, to sell much of its output to Pacific Corp for use by Oregon customers. So the Oregon court said, well, that's enough to assert personal jurisdiction, and in fact, over time, this company that was contesting Oregon jurisdiction sold 41% of its output to Oregon customers. And that is nothing that we have similar in any respect here, but we have 100% of the sales going to consumers, Michigan customers, and all of its generating facilities being located in Michigan. We think that the cases that are much more applicable and on point are, as I cited in my briefs, Stevens v. Indiana Public Service Company, Hawk v. Indiana Public Service Company, and to a lesser extent, Blakey. I don't remember who that was, the defendant in that case, but Stevens and Blakey are both 5th district decisions, and Hawk is the 1st district decision. Stevens, the defendant utility, known as Indiana Public Service, was the part two interconnection agreement with another Indiana company by which the defendant may purchase energy made in Illinois through the Indiana company, and energy made or produced by the defendant may have been sold to the Indiana company to customers in Illinois. Indiana Power also owned a natural gas pipeline in Indiana that was connected to a pipeline in Illinois, and also had banking accounts with our Chicago banks, and the court held in that case, the district held that these limited activities were insufficient for assertion of personal jurisdiction on a general jurisdiction basis. In Hawk, the 1st district also held that there was no basis to assert personal jurisdiction over the defendant utility, although it purchased 40 to 50% of its coal used to generate electricity in Illinois, and leasing trucks to pick up coal in Illinois from an unknown corporation. It also advertised it in Chicago. In both those cases, the court noted that being connected with an interstate pipeline that goes through Illinois is not purposeful activity. related to Illinois is sufficient to impose personal jurisdiction. The court noted that these types of interstate pipelines are common in many of Illinois and many or most of the states of the country, and it would be improper to assert jurisdiction on that basis because the pipelines go through a different state. How did they generate their power? How did they generate their power? I'm sorry? Was it coal power? You're talking about consumers? Yes. I'm not sure. I would assume so, but I don't know that. There's different ways to generate power. I'm sorry. I don't know that. I don't think that's the right terminology. But they were mainly a buyer of power instead of a seller as far as to the grid. They bought power off the grid rather than sell it. Did they ever sell any power off the grid, to the grid? Consumers? Yes. Yes. I mean, it produced most of its power, and I understand that. I believe that. If it's short, then it buys it from the grid. If it's long, it sells it to the grid. Exactly. Were they always short or always long? Overall, it appears that they were short because at least in this time period that you see in some of the records, they had purchased 22% of the power from the grid. So I don't know that that's necessarily factually accurate, but I can assume based upon that that they produced whatever 78% of their power when they purchased initial power, although I don't think that's really spelled out, to be honest. But anyway, we have these interstate pipelines running through most states in the country. The last case is the Blakey case, which was a venue case. It wasn't doing business in Madison County, so a bit different in that respect, but it was a case that was discussed by the Stevens court, and now the judge is doing business standard. And this court held in that case that the defendant selling electricity to other power companies through interconnection agreements, which were part of a nationwide grid system, and that therefore some of that power could have gone to customers in Madison County and not established new businesses. It's a little too speculative and too opinionated to apply. The plaintiff's arguments in this case, we believe in the briefing, misstate and mischaracterize the nature of the relationship between MISO and its consumers and member companies. Again, they characterize MISO as a middleman in the chain. That's not accurate because, again, the consumer sells its product to Michigan customers, not to Illinois customers. It generates most of its own power. It doesn't sell to Illinois and drives no benefit to sales in Illinois. And the relationship between MISO and consumers is not as characterized by the plaintiff or assertive as something like a single-entry product that subjects to jurisdiction because somehow affiliated with MISO. Your Honors, we believe that there's no basis for asserting personal jurisdiction over consumers in Madison County Court because it does not do business, but also because any contacts that it does have are so minimal, so attenuated, so speculative, so gratuitous that it doesn't establish, in addition to doing a business standard, it doesn't establish the minimum contacts that it must have in order to be subject to jurisdiction by an Illinois court. And there's nothing raised other than this membership in MISO, which is an independent corporation of a separate legal entity created by and supported by the Federal Energy Regulatory Commission to increase competition and eliminate monopolistic energy practices. Separating these two types of energy production from energy transmission. One of over 130 members, but it's still an initiative corporation that calls all its clients to see if there's evidence of no Illinois contacts. As Justice Walsh pointed out, it does put its funds for energy into the transportation grid, as do numerous other energy providers, but it takes it out of its service initiative customers. Thank you. Thank you, counsel. Counsel? Good morning. May it please the Court? Yes, Your Honor. My name is Stephen Oresti, and I represent Robin or Rebecca Hodap. Robin Hodap is an insulation worker who worked a variety of places in Michigan, including, I believe, a nuclear power plant called Consumer's Energy. Nuclear? I think it was, but I'm not 100% certain on that. Mr. Hodap was diagnosed with medicines of pelioma. It's a particularly virulent form of lung cancer. Attributed to exposure to asbestos and asbestos products. He filed suit against many of the premises where he worked and numerous products that he worked with in Madison County, Illinois. Unfortunately, while his case was pending, he succumbed to the disease, and his wife, Rebecca, is maintaining this action. Now, the case law here is not greatly in dispute, nor are the facts. What is disputed is the significance of the facts. Well, are we going to be back here again on a forum non? It's quite possible, Your Honor. Forum non, venue, workers' comp exclusion, there's a whole host of issues that are lurking in the shadows. But today we're here on jurisdictional grounds. Right. And I can tell from your questions that you've grasped the very facts that the significance of which the defendant and I, we have our dispute about. Well, we might be waiting on the Illinois Supreme Court to say something. Okay. And the nature of these electric utilities are that they are interconnected. They are physically connected by a grid system. It is such that if a circuit breaker trips in Ohio, sometimes the lights go out in New York City. They are not islands. They're not independent. Consumers, like very many of these electric utilities, relies on the grid. At times of plant shutdown or maintenance, they may draw electricity from the grid to supply to their local customers, be they residences or industries or commercial facilities. At times when they have excess capacity, they may pump electricity out to the grid where it can be used in adjoining states. There's no dispute here that consumers participated in that sort of arrangement through a network which they call MISO, M-I-S-O. And that's the key here. What is the significance of participating in that grid arrangement, which includes the state of Illinois? This court has had occasion to consider the issue or a similar issue in other cases. Council referred to the Stevens decision, the Hawk decision, and the Alderson decision. All three, I believe, involved electric utilities. All three at least considered the issue of grid involvement. On the Stevens and the Hawk's decisions, the court did not find sufficient context to support jurisdiction in Illinois, but we believe it's distinguishable because in those two decisions, the court was convinced that the entity that was doing the selling and the purchasing of power into Illinois was completely separate and distinguishable from the defendant that the plaintiff was trying to assert jurisdiction over. Here we maintain that MISO, despite the name independent, being in the title, is not truly independent. The defendant's own admission that it is one of a number of entities that own and control and participate in MISO was found by the trial court to be significant enough that it could be a disregarded entity. Merely calling something independent doesn't make it so. And I think that's a key difference between the Stevens and the Hawk decision. The Alderson decision did find jurisdiction over an out-of-state utility. And I would note in the Stevens decision, even with the court finding that it was an independent entity that did the distribution in Illinois, the elder Justice Harrison in that case dissented from the opinion and thought that there was enough there to maintain jurisdiction. MISO in their papers has asserted a little bit over 20% of the power, I believe, comes from MISO. Presumably some of that is coming from Illinois. I don't think they've stood before us and maintained that none of it comes from Illinois. In fact, the contrary is true. Some power does originate in Illinois. How are you going to figure that without knowing how much Illinois took in and how much they sent out of each of the 134 people? We don't know that, Your Honor. But it does appear that they are availing themselves of that opportunity on a regular and continuing basis, such that subjecting them to jurisdiction in Illinois does not offend our notions of fair play. Now on that dissent by Harrison, is that a fifth district or is that supreme? That was a fifth district. I believe that's in the Stevens case. Okay. And he found that he wouldn't find that there was jurisdiction over that particular utility. And as I say, I think here the three cases, the two that did not find jurisdiction, Stevens and Hawk, are distinguishable because the majority opinions in those two cases, the courts thought that the Northern Indiana Public Service, NPSCO, was completely separate and independent, whereas here it appears that MESO is at least partially owned by the defendant that's at issue and therefore that degree of independence is lacking. So I think that Stevens and Hawk, if you apply the reasoning to our situation, you would find that jurisdiction is present. I could analogize to a railroad. If you had a railroad operating in Michigan and the railroad told you that most of their traffic was local, that they delivered most of their freight within the state of Michigan, and only occasionally did they run a train across Illinois, but perhaps 20% of the time they would stop and interchange cars within Illinois, I don't think the court would have very much trouble finding that there was sufficient context within Illinois to subject them to jurisdiction here. I hope there's no more questions. I don't believe there are. Thank you, Your Honor. Thank you, Counsel. Counsel? Your Honor, I take exception with the characterization that MESO is not an independent, separate company or corporation from Consumers Energy. That is absolutely the case. As I indicated in the initial argument, it is almost the opposite when you look at it because the purposes that it was created for, it's an independent company, independent management, independent ownership. Yes, they call these 134 entities members, but they're members that are energy producers, brokers, suppliers, that are interacting with MESO more in the nature of a regulated customer business relationship. They have absolutely no control or authority over MESO. The purpose for MESO was solely to create less, greater, more competitive environments in the energy market to prevent companies that had monopolies, vertical monopolies where they were producing and transmitting and handling the transmission guides within their region from blocking out these other regional utilities that could not get into the market so they could basically charge whatever they wanted. And it was necessary to create this organization. It has to be a separate and independent organization in order to foster the purpose of the Federal Energy Regulatory Commission. How do they set the rate? Pardon? How do they set the rate? Exactly. Well, I want to know, how do they? Okay. They do set the rate. Well, it is a uniform rate. I know that. I don't know exactly what the mechanism is for setting the rate. But in other words, all the electricity, I guess it probably depends on the time, but it's the same rate I understand on the entire system. But that would change monthly or daily or whatever. Absolutely. But no matter who it's sold to, whether it's sold to this region or that region, it's going to be the same rate, which is something that didn't happen because companies were able to charge whatever they wanted. Somebody else could supply the power. I think what was cited in our supply brief, the case of Central Iowa Power versus MESO, which does have a very good analysis of exactly what MESO is, the reasons that it was created and its affiliation with its member companies as well as the Federal Energy Regulatory Commission. So I do think that is a very important point, and I do respect strongly the characterization that it's not an independent company and that things that MESO does should be attributed to my client consumers' energy because that is simply not the case. And, again, the remotest and most attenuated possible contact where speculatively maybe some percentage of the power on the entire grid, and obviously there's some of it that comes from Illinois producers, but it's fungible. We don't know exactly where or what energy came from, and consumers doesn't go into Illinois to try and get power from Illinois. It doesn't try to sell it to any customers in Illinois. It's not doing anything to avail itself of Illinois law. MESO, sure, maybe MESO is doing that, but it's a separate and independent corporation. It's not a co-op. It's not a unitary business that you can attribute their jurisdictional subject, being subjected to jurisdiction to consumers being subjected to jurisdiction. Similarly, with regard to the railroad analogy, it doesn't go into Illinois. Consumers are solely based in Michigan. It doesn't have any customers or contacts in Illinois. That's not an analogous analogy. It doesn't own any of the transmission lines outside of Michigan. So the significance of participation in this system is the obvious and crucial issue in the case. And we think that imposing jurisdiction over consumers on that basis would be improper because it is simply not doing business in Illinois. MESO is doing business in Illinois. Consumers are not doing business in Illinois. And such an attenuated contact to a certain person's jurisdiction on that basis would be offensive to the traditional mission of the railroad and would be unjustified in the process of law enforcement. We do request that the trial court ruling be reversed and consumers dismissed. Thank you. We appreciate the arguments and briefs of counsel. We'll take the case under advisement.